UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

FOREST DIAMONDS INC., d/b/a AMINOV
DIAMONDS,

              Plaintiff,

    -against-

AMINOV DIAMONDS LLC, et al.,

              Defendants.

--------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/14/10

06 Civ. 5982 (GEL)

**OPINION AND ORDER**

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Sari E. Kolatch, Cohen Taubner Spievack & Wagner,
P.C., New York, NY, for plaintiff.

James A. Powers, Reston, VA, for defendants.

GERARD E. LYNCH, Circuit Judge:[1]

    This is an action for conversion. Plaintiff Forest Diamonds, Inc., d/b/a Aminov

Diamonds ("Forest" or "plaintiff"), is a California corporation in the wholesale diamond

business. From 2003 until 2005, it operated an office in the diamond district of New York City,

managed by defendant Yehuda Aminov ("Yehuda" or "defendant.")[2] Forest, one of whose

founding partners was Yehuda's uncle, Isak Aminov, did business under the name Aminov

Diamonds. In November 2005, Yehuda ceased working for Forest, and incorporated a new

company also called Aminov Diamonds. Plaintiff contends that over the period he worked for

---

[1] The Honorable Gerard E. Lynch, United States Court of Appeals for the Second Circuit,
sitting by designation.

[2] Because the case involves several individuals and companies bearing the surname
"Aminov," the Court will refer to Yehuda Aminov and his uncle, Isak Aminov, by their first
names in the interest of clarity.

Forest, Yehuda converted approximately $550,000 in diamonds and in the proceeds from the sale of diamonds. It seeks recovery of these assets.[3]

Since this action began, defendant has filed for personal bankruptcy under Chapter 7 of the United States Bankruptcy Code. Plaintiff claims that any liability defendant has is not dischargeable in bankruptcy under one of the exceptions to discharge enumerated in 11 U.S.C. § 523(a). At the request of the parties, and pursuant to an order of the United States Bankruptcy Court for the District of New Jersey, the Court agreed to accept jurisdiction over this aspect of the dispute.[4]

The parties tried the case before the Court from August 10 to August 13, 2009. This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). To the extent any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law, and vice versa. As detailed below, the Court concludes that plaintiff has been

---

[3] Plaintiff originally brought claims against both Yehuda Aminov and Aminov Diamonds, L.L.C., for unfair competition, false designation of origin, and false description under the Trademark Act of 1946, 15 U.S.C. § 1125(a), as well as for false advertising, unfair competition, and trademark dilution under state law. These claims were dismissed before trial, pursuant to a settlement agreement. The only substantive claim remaining is the conversion claim against Yehuda Aminov personally.

[4] In addition, in its joint pre-trial submission, plaintiff seeks resolution of a motion for sanctions it made in response to the revelation that defendant had destroyed the hard drive of his personal computer subsequent to the filing of this action. Defendant does not contest that he destroyed his hard drive. (Am. Jt. Pre-trial Statement.) Defendant had not responded to this matter at the time he filed for bankruptcy, when the Court stayed plaintiff's claim, pursuant to 11 U.S.C. § 362(a)(1). Defendant has never filed papers responsive to plaintiff's sanctions motion. At trial, the Court requested that plaintiff clarify in its post-trial submissions whether was seeking monetary sanctions or some sort of adverse inference. (8/13/09 Tr. 711.) Neither party addressed the issue of monetary sanctions in its submissions after trial. Under the circumstances, the Court declines to assess monetary sanctions against defendant. The effect of defendant's destruction of his hard drive on the findings of the Court is discussed below.

successful in its conversion claim and is due damages in the amount of $352,481. Additionally, the Court concludes that this sum is not dischargeable in bankruptcy.

**FINDINGS OF FACT[5]**

## I.    Background

    A.    *The Parties*

1. Forest Diamonds, Inc. is a California corporation in the wholesale diamond business. (Compl. ¶ 6.)

2. Yehuda Aminov is an individual residing in Lakewood, New Jersey. (Y. Aminov Decl. ¶ 1)

    B.    *Subject-Matter Jurisdiction and Venue*

3. Plaintiff's conversion claim is before the Court on the basis of supplemental jurisdiction, under 28 U.S.C. § 1367, although jurisdiction would also be proper on the basis of diversity of citizenship, under 28 U.S.C. § 1332, since the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000. The Court has jurisdiction over plaintiff's bankruptcy claim pursuant to an order of the Honorable Raymond T. Lyons, Judge of the United States Bankruptcy Court for the District of New Jersey, entered on June 9, 2008.

4. Venue is proper in this Court under 28 U.S.C. § 1391, since a substantial part of the

---

[5] The Court makes these findings of fact based on the evidence of record, reasonable inferences drawn therefrom, assessment of credibility and demeanor, and resolution of any conflicts in the evidence. Citations to exhibits and testimonial evidence indicate some but not necessarily all of the evidence pertaining to a given finding. The live testimony of most witnesses consisted principally of cross-examination, since direct testimony was presented to the Court, prior to trial, via sworn declaration. Hanan Totayev and Yehuda Aminov presented in-court direct testimony that supplemented their declarations. Igal Haimoff presented only in-court testimony and did not submit a sworn declaration.

events giving rise to plaintiff's claims took place in the Southern District of New York.

## II.    The Founding of Forest Diamonds, Inc.

5. At the time of the events giving rise to this action, Forest Diamonds, Inc., was owned by Joseph Totayev ("Joseph")[6] and Isak Aminov ("Isak"). (Compl. ¶ 6-7.) Joseph and Isak are citizens and residents of Israel. (J. Totayev Decl. ¶ 1; I. Aminov Decl. ¶ 1.)

6. In 1982, Joseph and Isak founded a company to manufacture and sell diamonds in Israel. This company eventually came to be called TAM Diamonds, Ltd ("TAM"). (I. Aminov Decl. ¶¶ 3-4.)

7. In 1990, TAM created a United States corporation, called Aminov Service Baguette, Inc., to market and sell its diamonds here. (Id. ¶ 6.) This business was managed by Isak's brother Yaakov Aminov and had a single office in Los Angeles, California. (Id.)

8. After Yaakov Aminov's death in 2002, TAM closed Aminov Service Baguette, Inc., and founded a new corporation called Aminov Diamonds, Inc., which was managed by Hanan Totayev ("Hanan"), Joseph's son. (Id. ¶¶ 9-10.) Originally, Aminov Diamonds had only a single office in Los Angeles. (Id.)

9. Later in 2002, TAM recruited Yehuda, Isak's nephew, to open a second office of Aminov Diamonds in New York, New York on a trial basis. (Id. ¶¶ 11-12.) Originally, Yehuda worked out of the office of G.R. Fancies Inc., a diamond company of which his brother, Israel Aminov, was the manager. (Id. ¶¶ 12-13.)

10. In March 2003, Isak traveled to New York City. He and Yehuda together leased

---

[6] As Joseph's son Hanan Totayev also figures in the case, the Totayevs also will be referred to by their first names for the sake of clarity. See n. 2, supra.

office space in New York's diamond district, and established a permanent New York office for Aminov Diamonds. (Id. ¶ 14.)

11. In May 2003, Aminov Diamonds changed its name to Forest Diamonds, Inc., although it also continued to be known in the industry by the name Aminov Diamonds. (Id. ¶ 15.)

### III.   The Operation of Forest's New York Office

12. Forest's New York office primarily sold diamonds that it received on consignment from TAM. (I. Aminov Decl. ¶ 21; H. Totayev Decl. ¶ 19.) On occasion, however, Forest would sell diamonds it received from other diamond wholesalers. (8/11/09 Tr. 262-63.) Each shipment that Forest received from TAM was accompanied by a handwritten list of the diamonds it contained, as well as the minimum amount for which Yehuda was authorized to sell each diamond (its "book value"). ( I. Aminov Decl. ¶ 23, 25; 8/10/09 Tr. 52.) These diamonds were stored in a safe in the Aminov Diamonds office. (I. Aminov Decl. ¶ 32.)

13. Forest would often place the diamonds it received from TAM with retailers for sale on consignment. Whenever a diamond was placed with a retailer for sale, Yehuda prepared a memorandum to be signed by the retailer in order to document the placement of the diamond. These documents were stored in the same safe that Forest used for storing diamonds. ( I. Aminov Decl. ¶ 32; H. Totayev Decl. ¶25; 8/10/09 Tr. 32.)

14. Once or twice per year, Isak would travel to New York to meet with Yehuda to audit Forest's New York office. He would count the inventory in the safe, plus the consignment memoranda he found there. Isak would then convey this information to Joseph, who would compare these findings to his own records concerning what was shipped to the United States and

what proceeds were received back from the United States. (I. Aminov Decl. ¶ 32.)

15. Prior to May 2005, Isak's audits uncovered no significant discrepancies between the diamonds in the safe, the memoranda he found there, and TAM's records. On occasion, small shortages were uncovered, but in all of these instances Yehuda would produce additional memoranda, which he would fax to Joseph in Israel, sufficient to explain any discrepancies. (8/10/09 Tr. 30-31, 33, 78.) Isak never took any steps to verify that the memoranda shown to him by Yehuda – either in the regular course of an audit, or when produced later to account for auditing irregularities – were accurate. Specifically, Isak never contacted any of Forest's customers to see if they actually possessed the diamonds that the memoranda showed them to possess. (I. Aminov Decl. ¶ 35.)

## IV.    Forest's Extensive Use of Cash in its Business

16. Plaintiff's witnesses claimed that cash payments, both from customers and to Forest employees, were rare. (8/10/09 Tr. 39.) Both Joseph and Isak testified that the use of checks to pay salary was preferred over cash (Id. 39, 157), and Isak testified that he specifically discouraged Yehuda from accepting cash payment for diamonds in lieu of checks. (Id. 39, 146.) Hanan testified that in several years of managing Forest's Los Angeles office, he had only conducted two or three transactions in cash rather than by check, although he conceded that the business practices of the New York office may have been different. (8/12/9 Tr. 356.)

17. Defendants' witnesses, however, credibly painted a very different picture of the extent to which Forest conducted its business in cash. Yehuda testified that between thirty and forty percent of the proceeds from sales in the New York office were paid in cash. (8/12/09 Tr. 528-9.) Dennis Nektalov, a salesperson who worked for Forest from the spring of 2003 until the

6

fall of 2004 (Nektalov Decl. ¶ 2), credibly testified that his entire salary was paid in cash, as well as any sales commissions he received. (Nektalov Decl. ¶ 5; 8/11/9 Tr. 277.)

18. Yehuda kept records for the New York office on Forest's computer, using an accounting program called QuickBooks. All sales and payments were recorded using this program. Some transactions were designated as cash transactions in QuickBooks, but not every cash transaction was so designated. (8/12/09 Tr. 521-22.)

19. A subset of transactions was also reported separately in a handwritten ledger. (Def's Ex. P; 8/12/09 Tr. 506-508.) Yehuda testified that all the transactions recorded in the handwritten ledger were conducted in cash, and that Forest's secretarial staff were instructed to record all cash transactions in this ledger. (8/12/09 Tr. 509.) Additionally, cash expenditures were recorded in the same log. (Id. 510.)

20. The federal and state tax returns of Forest for 2002-2004 and 2006 were entered into evidence by Yehuda. (Def's Ex. DD.) Although Hanan testified that Forest was consistently profitable and regularly was able to return money to Joseph and Isak in Israel (12/11/09 Tr. 348-351), Forest reported either losses or merely nominal profits to federal and state tax authorities for these years. Some portion of the money returned to Israel may have represented the return of capital, rather than corporate profits. Nonetheless, the Court concludes that Forest failed to report a substantial amount of the income that it received in cash, and that its tax returns did not present an accurate picture of the business.

21. The Court found neither plaintiff's witnesses nor Yehuda wholly credible on the subject of the use of cash by Forest. The credibility of Joseph and Isak was significantly undercut by the documentary evidence, particularly Defendant's Exhibits P and BB, which

7

appear to be a record of the use of cash by Forest, as well as by their manifestly inaccurate tax returns. Moreover, as more fully discussed below, the presence of significant cash in the business was further corroborated by the testimony of Nektalov, who was for the most part a disinterested witness. Yehuda's credibility, on the other hand, was compromised by his 2005 tax return (Pl's Ex. 26), in which he claimed to have earned only $19,800 in salary and commissions from Forest, despite his testimony that he consistently earned many times that sum. (8/13/09 Tr. 646.) Additionally, Yehuda's credibility was lessened by his admission that he had destroyed the hard drive of his personal computer after this litigation had begun, and his implausible story that he did so to erase pornography sent to him through email by Hanan in a plot to break up his marriage. (8/13/09 Tr. 662-63.) Moreover, like several other witnesses at trial, Yehuda was often evasive in response to cross-examination.

22. Nonetheless, the Court largely credits defendant's testimony that Forest conducted a significant portion of its business in cash. The precise percentage of Forest's business that was conducted on a cash basis, or what became of the cash received, is not conclusively established by the direct evidence in the record, and must be the subject of inference.

## V.    **Forest's Expatriation of its Cash to Israel**

23. Plaintiff's witnesses contended that all money returned to Israel, with the exception of some that had been paid out to individual employees, was moved via bank transfer. Joseph and Isak specifically denied that Forest's cash was ever transported directly to Israel by any third parties. (8/10/09 Tr. 83, 146.) The Court does not credit this testimony for several mutually reinforcing reasons. First, neither Isak nor Joseph was a particularly credible witness. Both were evasive in response to cross-examination. In demeanor, Joseph was glib and combative, Isak was

8

unresponsive and manifestly uncomfortable, and neither was persuasive. Second, both had an interest, not only in the success of this litigation, but in avoiding any finding that they exported unreported cash income. Third, it is difficult to square all aspects of plaintiff's version of events, which posits substantial misappropriation by Yehuda, regular reviews of Forest's New York office by Isak, and no trafficking in untraceable cash. If, as plaintiff contends, all transactions were documented by bank records, it should have been easy for Isak to detect any alleged defalcation. Finally, as detailed more extensively below, Yehuda's contrasting account of large sums of cash, much of which was repatriated to Israel by money launderers and other couriers, is inherently credible and is corroborated by other testimony and contemporaneous documents.

24. Yehuda and Nektalov far more credibly testified that Forest regularly and systematically transported significant amounts of cash to Israel.[7] Yehuda testified that he was instructed by Isak to bring cash on a regular basis to the Fifth Avenue office of Elian Boruchov. Beginning in early 2003, Yehuda visited Boruchov numerous times, each time bringing with him parcels containing up to $20,000. (Y. Aminov Decl. ¶¶ 15-17; 8/12/09 Tr. 535; Pl's Ex. 23.) Boruchov would count the money delivered by Yehuda and issue a small yellow sticker as a receipt. (8/12/09 Tr. 536.) These stickers were then collected by Isak when he came to New York City to conduct an audit, and were transferred back to Israel. (Id.) In addition to money from Forest's New York operations, Yehuda also delivered to Boruchov money that was given to him by Hanan (id. 543), which Hanan testified represented his personal money rather than cash

_____

[7] In reaching this conclusion, the Court gives no weight to Plaintiff's Exhibit 63T-3, a translation of a transcription of a phone conversation recorded by Hanan, in which Hanan purportedly mentioned the transfer of money to Israel through Boruchov. The accuracy of the translation of this exhibit, which was admitted at the very end of the trial, was disputed by the parties at trial (8/12/09 Tr. 459), and in their post-trial submissions.

belonging to Forest. (Id. 452-3.)

25. Yehuda also testified that when members of his family traveled from Israel to New York to visit him, they would return with bundles of cash to deliver to Joseph and Isak. Yehuda's mother-in-law transported $5,700 in this manner, and his father $18,000. (Id. 564.)

26. Yehuda additionally testified that at Isak's direction he would make cash payments to a man named Yossi Barak. Isak would then receive the same amount of money from Barak's relatives in Israel. (Id.)

27. Nektalov substantially corroborated Yehuda's testimony concerning cash transfers through Boruchov and others. He testified that on numerous occasions he witnessed Yehuda remove thousands of dollars in cash from Forest's safe and that he accompanied Yehuda as he delivered the cash to Boruchov in his office. (Nektalov Decl. ¶ 18.) Boruchov would then count the money in front of Yehuda and Nektalov. (Id.; 8/11/09 Tr. 300-01.) On occasion, Nektalov would also deliver to Boruchov for transport to Israel cash that came to Forest's New York office from its office in Los Angeles. (8/11/09 Tr. 321.)

28. Additionally, Nektalov credibly testified that on one occasion, when he notified Isak and Yehuda that he was traveling to Israel, Isak instructed him to bring with him cash from Forest's operations. Nektalov carried approximately $15,000 of Forest's cash and delivered it to Isak and Joseph at TAM's offices in Tel Aviv. (8/11/09 Tr. 315.)

29. While Nektalov's testimony was credible as to the fact that he participated in transfers of cash to Israel, it was unhelpful in estimating the amount transferred, even during the approximately 18 months that he worked for Forest. It was the Court's impression from Nektalov's demeanor that he exaggerated the amount of money transferred through Boruchov

during his in-court testimony, which was inconsistent with the estimates he originally provided in his declaration. Nektalov originally testified that he witnessed "over 10" cash transfers. (Nektalov Decl. ¶ 18.) On cross-examination, however, he claimed that there could have been as many as 40. (8/11/09 Tr. 299-200). Likewise, while Nektalov's original declaration claimed only that each transfer contained "a few thousand dollars" (Nektalov Decl. ¶18), on cross-examination he claimed that they all contained somewhere between $10,000 and $30,000. (8/11/09 Tr. 299-200). Despite the fact that he always watched Boruchov count the money he delivered, Nektalov testified on cross-examination that he had no specific recollection as to the amount of money that was generally handed over to Boruchov other than that it was always more than $10,000. (Id. 301.)

30. Nektalov's original, lower estimate of the amounts and frequency of the cash transferred through Boruchov is roughly concordant with the transfers recorded in Plaintiff's Exhibit 23 (which is also reproduced as Defendant's Exhibit BB). These pages were described by Yehuda as records of all of money sent to Israel through various intermediaries, as well as some of the commission paid to Forest's salespeople and to himself. (8/12/09 Tr. 531-2, 584-5.) Although they are handwritten, difficult to decipher and largely written in Hebrew, these pages appear to the Court to be what Yehuda described them to be, and the Court determines that they are the best basis for estimating the amount of cash transferred to Israel.[8] These documents show 8 cash transfers in 2003, 5 in 2004 and 1 in 2005, all for sums between $3,000 and $20,000.

---

[8] The Court gives no weight to Yehuda's self-serving statements in his phone discussions with Hanan concerning how much he transferred (Pl's Ex. 62) and to his claim in his declaration that he visited Boruchov between 30 and 40 times, each time delivering more than $10,000. (Y. Aminov Decl. ¶ 17.)

Totaling the numbers on these pages shows cash transfers through Boruchov, Barak and Yehuda's family of $102,400 in 2003 (Pl's Ex. 23, page 23), $63,000 in 2004 (Pl's Ex. 23, page 24), and $10,000 in 2005 (Pl's Ex. 23, page 23; 8/12/09 Tr. 586).[9] Additionally, the Court credits Nektalov's testimony that he transported approximately $15,000 to Joseph and Isak personally. This sum is not recorded in Yehuda's notes. $14,000 of the money Yehuda transported to Israel originated in Forest's Los Angeles office, rather than in New York (Pl's Ex. 23, page 23). Therefore, by a preponderance of the evidence, the Court concludes that the cash transported to Israel totaled approximately $190,400, of which approximately $176,400 derived from Forest's New York operations.[10]

## VI.     The May 2005 Audit

31. In May 2005, Joseph, rather than Isak, traveled to New York to audit Forest's New York office. (J. Totayev Decl. ¶ 12.) During this audit, Joseph uncovered an inventory shortage of approximately $110,000. (Id.; 8/10/09 Tr. 170.) Joseph and Yehuda looked through Forest's

---

[9] In a "Supplemental Statement" supplied to the Court together with his other post-trial submission, defendant argues that evidence shows that $274,360 in cash was transferred to Joseph and Isak in Israel. (Def's Supplemental Statement, unnumbered page 11.) It is not clear how defendant arrives at this sum. Over the course of the trial, other documents, including those assembled in Defendant's Exhibit P, were described as recording some transfers of cash to Israel. (8/12/09 Tr. 512.) No evidence was presented, however, to the effect that these transactions were not accounted for in Plaintiff's Exhibit 23, or that other transfers were effected by Yehuda without recording them in this exhibit, with the exception of $15,000 carried to Israel by Nektalov. The Court credits Joseph's testimony that the $9,260 sum mentioned Defendant's Exhibit RR represents Yehuda's own money. (8/10/09 Tr. 149.)

[10] In his Supplemental Statement, defendant alleges that plaintiff has further records of cash transfers to Israel through Boruchov that it did not provide defendant in discovery. (Def's Supplemental Statement, unnumbered page 10.) No evidence supports this contention. Any risk that the Court's factual findings undercount the amount of cash transferred to Israel through Boruchov due to an incomplete evidentiary record is primarily attributable to the destruction of Forest's business records by defendant, discussed below.

office together to see if they could discover any missing memoranda that would account for this discrepancy, but they did not find any. After Joseph returned to Israel, however, Yehuda produced memoranda that he claimed he found in Forest's safe and that accounted for the shortage. Nonetheless, the May 2005 audit caused Joseph to become concerned about how well Yehuda was managing the New York office. (J. Totayev Decl. ¶¶ 15-16.)

## VII.   Yehuda Begins to Sell Diamonds for Himself

32. In May 2005, Yehuda met Joseph and Hanan in Las Vegas. Joseph and Hanan informed Yehuda that they would be closing Forest's New York business at the end of the year. (8/12/09 Tr. 605-6.)

33. Yehuda convinced Joseph and Isak to let him continue to sell diamonds for Forest until the end of the year. Isak and Joseph subsequently changed their minds and decided to continue Forest's New York operations. They communicated this to Yehuda. (I. Aminov Decl. ¶¶37-38; 8/12/09 Tr. 606-07.) The incident, however, caused Yehuda to become concerned about his future with Forest and to formulate a plan to enter the diamond business on his own. (8/12/09 Tr. 606.)

34. In June 2005, Yehuda began to sell diamonds for himself in addition to those he sold for Forest. (Y. Aminov Decl. ¶ 44.) He incorporated a company called Aminov Diamonds, and began selling diamonds under that name, while continuing to work for Forest for several months. (8/12/09 Tr. 607.) The phone and fax numbers for Yehuda's company differed from the phone and fax numbers of Forest only in their final digit. (H. Totayev Decl. ¶ 52.) Moreover, while Yehuda claimed that he made clear to customers when he was operating on his own account and when for Forest (Y. Aminov Decl. ¶ 43), the similarity of names, customers, salesman, and

13

phone numbers made confusion inevitable. It is a reasonable inference, and the Court does infer, that such confusion was intended by Yehuda.

35. Isak testified that he only learned that Yehuda was selling diamonds after he visited New York in November 2005. (I. Aminov Decl. ¶ 50.) In the face of this testimony by Isak, the Court did not find credible defendant's testimony that he had informed Joseph and Isak that he would be starting his own business selling diamonds while continuing to work for Forest and that they had consented to this arrangement. (8/12/09 Tr. 546, 606.) There is no apparent reason why Joseph and Isak would agree to such a deal, and no evidence in the record supports defendant's testimony. Moreover, it is a reasonable inference, and the Court infers, that the intentional confusion generated by the similarity of names was designed in part to obscure from Forest's principals the fact that Yehuda was operating on his own account.

## VIII.  The Checks to Pointers, Inc.

36. In early November 2005, Yehuda called Isak and informed him that he was immediately ceasing work for Forest. (Y. Aminov Decl. ¶49; I. Aminov Decl. ¶40; 8/10/09 Tr. 74.)

37. On November 11, Yehuda made out two checks to a company called Pointers, Inc., one for $20,000 and another for $51,000, copies of which were entered into evidence. (Pl's Ex. 24.) $71,000 represented essentially all of the funds available for withdrawal from Forest's bank account on that date. (I. Aminov Decl. ¶ 49; H. Totayev Decl. ¶ 34.) These checks were deposited by Pointers, which paid Yehuda $71,000 when they cleared. Yehuda kept this money. (Y. Aminov Decl. ¶¶ 51, 54.)

14

38. Yehuda claimed that this $71,000 represented partial payment for the commission he was owed by Forest for the time he had worked there, and that he was authorized to withdraw this money. Yehuda testified that the method of paying this commission – making out a check to a third party and then receiving cash for it in return – was mandated by Isak. According to Yehuda, Isak further insisted that he lie to anyone inquiring about the checks, and that he describe the $71,000 as payment for merchandise from Pointers. (Y. Aminov Decl. ¶ 50; 8/12/09 Tr. 614-15.)

39. Isak, however, credibly testified that he had never done business with – or even heard of – a company called Pointers, Inc. (I. Aminov Decl. ¶ 55.) Hanan testified that in his review of all of the records of Forest's New York office, he found no reference to Pointers, Inc., and had no reason to think that they ever did business with Forest. (H. Totayev Decl. ¶ 35 n. 1.)

40. In the face of Isak's and Hanan's testimony that they had no knowledge of Pointers, Inc., the Court did not find credible Yehuda's explanation that writing these checks to himself represented an authorized payment of commission. There was no advantage to Forest in having this payment withdrawn from its bank account by check and delivered to Yehuda in cash. Rather, the payment of the money in cash, and the apparent attempt to disguise the ultimate recipient of the payment by use of Pointers as an intermediary, compels the conclusion that this $71,000 was taken by Yehuda without Forest's approval.

IX.    **Forest's Business Records**

41. On November 14, Isak traveled to New York. Isak stayed with Yehuda at his house in New Jersey. (I. Aminov Decl. ¶¶ 42, 44.) When Isak went into town to visit Forest's offices, he discovered that they were in disarray and that Yehuda had removed many of the company's

15

business records. (I. Amivov Decl. ¶ 44). Additionally, Isak discovered that the office's phone and fax lines had been disconnected, and the numbers redirected to Yehuda's cell phone. (I. Aminov Decl. ¶ 46.) The office's version of QuickBooks had been deleted from Forest's computer. (H. Totayev Decl. ¶ 39.) Substantial inventory, however, still remained in the office's safe. (8/11/09 Tr. 255.)

42. Yehuda testified that he removed Forest's files and business records, but that he did so with Isak's permission. (8/12/09 Tr. 546.) Yehuda testified that he took the records both to help him start up his new business and also to document the commission owed to him by Forest. (8/12/09 Tr. 546-7.) Additionally, Yehuda testified that Isak gave him permission to disconnect the phone in Forest's office and to have the number forwarded to his cell phone. (8/12/09 Tr. 613.) Isak denied that he gave Yehuda permission to take these actions, or that he would have any reason to make such concessions to Yehuda. (I. Aminov Decl. ¶ 54.) These actions were directly harmful to Forest's business interests, and the Court found Yehuda's contention that he had Isak's permission to take them not to be credible.

43. All of the items taken from Forest's office were eventually returned to plaintiff. (8/12/09 Tr. 551.) However, they were returned in disarray, making assessment of Forest's finances and accounts difficult. (H. Totayev Decl. ¶ 40.)

## X.  **The Missing Amount**

44. Hanan, Joseph, and Isak reconstructed Forest's records over the course of many months. During this process, they discovered shortages in Forest's accounts amounting to several hundred thousand dollars (H. Totayev Decl. ¶¶ 56-57; I. Aminov Decl. ¶ 52). In preparation for this litigation, Hanan calculated the size of this shortage, although he was unable

16

to determine how much of this shortage was due to missing cash and how much to missing inventory. (H. Totayev Decl. ¶ 58-59; 8/11/09 Tr. 359.) Plaintiff presented a summary of this accounting in its Exhibit 39. With a few exceptions, discussed below, the Court accepts Hanan's calculations.

45. Hanan calculated the amount missing from Forest's accounts as follows (H. Totayev Decl. ¶¶ 58-73; see 8/11/09 Tr. 191-271; Pl's Ex. 39): He began by totaling the "book" value for all of the diamonds in each shipment from TAM in Israel to Forest. The book value was the minimum amount for which Yehuda was authorized to sell the stone. (8/11/09 Tr. 197.) The book value of all of the stones shipped from TAM to Forest's New York office was $2,861,972. (8/11/09 Tr. 192.) Hanan added to this sum the value of all of the diamonds shipped for sale from Forest's Los Angeles office to its New York office. This amount was $1,291,022. (Pl's Ex. 39; 8/11/09 Tr. 213.) From this amount, Hanan subtracted $136,880, the book value of the diamonds returned to TAM, and $242,500, the value of the diamonds returned to Forest's Los Angeles office. (8/11/09 Tr. 215-18). The total book value, therefore, of the merchandise over which Yehuda had control in his capacity as manager of Forest's New York office was $3,773,614. These calculations were supported by the invoices plaintiff produced in evidence. (Pl's Ex.s 40, 41, 42, 43, 44.) .

46. While $3,773,614 represents a fair estimate of the minimum amount of money Forest would have received had it sold all its entire inventory of TAM diamonds at the minimum price authorized by Isak and Joseph, Forest generally sold its stones significantly above their book price. (H. Totayev Decl. ¶ 69.) Since the state of Forest's records made it impossible for Hanan to determine precisely which stones were sold by Yehuda and the other salesmen in the New

17

York office and what their book prices were, Hanan estimated the profits generated by examining Forest's QuickBooks. In this calculation, he considered both the diamonds received from TAM and also those sold on commission from other diamond wholesalers. At the usual margins for such items, these were $234,387 for the TAM diamonds and $54,622 for the diamonds received from other wholesalers. (8/11/09 Tr. 260-64; H. Totayev Decl. ¶¶ 69-70; Pl's Ex. 39.) Based on this calculation, which the Court finds to have utilized a reasonable and conservative methodology, the Court estimates that the total value of the cash and merchandise over which Yehuda had control over the course of his time as manager of Forest's New York office was $4,062,623.

47. In calculating the amount missing from Forest's account, Hanan subtracted the value of all of the wire transfers of money to TAM in Israel. (H. Totayev Decl. ¶ 62.) Hanan originally calculated this amount to be $2,165,900. (Pl's Ex. 39.) At trial, however, defendant produced records of $94,500 of additional bank transfers to Israel that were not included in Hanan's calculation. (Def's Ex. EE; 8/11/09 Tr. 365.) The total amount of money wired to TAM, therefore, totaled $2,260,400. Additionally, Hanan subtracted the value of money wired to Forest's Los Angeles office by Yehuda in New York, which totaled $63,760. (Pl's Ex. 39; 8/11/09 Tr. 232.)

48. Hanan also totaled the salary and commission payments of Forest's employees. These totaled $215,530 and $93,564, respectively. (Pl's Ex.s 46-47; 8/11/09 Tr. 234-40, 250-255.) At trial, Hanan admitted that the amount of commission owed to Yehuda himself should be increased by $7,219. (8/11/09 Tr. 254.) The total amount of documented salary and commission payments, therefore, is $316,313. Additionally Hanan estimated – in a calculation

18

the Court adopts – that, as manager of Forest's New York office, Yehuda spent $92,900 on expenses. (8/11/09 Tr. 258-9; Pl's Ex. 39.)

49. Hanan also valued the inventory that was discovered by Isak in the safe of Forest's office as having a book value of $576,619. (8/11/09 Tr. 255; Pl's Ex. 48, page 8976.) Additionally, $9,203 was left in Forest's bank account at Bank of America. (H. Totayev Decl. ¶ 72; Pl's Ex. 51, page 8675.)

50. Hanan testified that Forest was able to recover $207,305 from the accounts receivable records discovered in its offices after Yehuda's departure. (8/11/09 Tr. 256-57.) Additionally, $7,242 was reported by Yehuda as uncollectible before he left Forest's employ. (8/11/09 Tr. 260.)

51. Finally, Hanan testified that he discovered records from several of the sales that Yehuda conducted for his own account while working for Forest. In all of these cases, Yehuda sold diamonds that he acquired from wholesalers other than TAM. Hanan calculated that these sales generated approximately $24,738 in profits for Yehuda. (8/11/09 Tr. 264-268; Pl's Ex. 39.) The Court concludes, however, that this sum, which represents profits Yehuda made on sales of items not belonging to Forest, is not relevant to plaintiff's conversion claim, and therefore excludes it from its calculations of the amount missing from Forest's accounts.

52. At trial, defendant proffered the testimony of his in-law, Igal Haimoff. Haimoff, who was apparently respected by both sides to the dispute, negotiated the return of Forest's business records, serving as a mediator between Yehuda and Isak. According to Haimoff, Isak told him during these negotiations – and Hanan later reiterated by telephone – that the only things missing from Forest's office other than the records in question were $30,000 and four pair of small

diamond earrings. (8/13/09 Tr. 682-88.) Despite his marriage to the sister of Yehuda's wife, which could be argued to make him an interested witness, Haimoff's testimony was extremely credible and the Court finds that the statements he attributed to Isak and Hanan were in fact made. They were made, however, shortly after Isak traveled to New York in November 2005, before Isak and Joseph had conducted a careful review of Forest's accounts, and before Hanan had calculated the size of the loss. Haimoff's testimony about these tentative, preliminary assessments of loss is therefore of little or no value in determining the amount of money missing from Forest's accounts.

## XI.    Ultimate Findings

53. The Court concludes by the preponderance of the evidence that the amount missing from Forest's accounts was $528,881. This sum represents the total of the amount of cash and diamonds not properly accounted for in Forest's accounts. The Court finds Hanan's methodology for reconstructing the business reasonable and persuasive, and generally finds Hanan a credible and straightforward witness, much more so than Yehuda, Isak or Joseph.

54. That $528,881 worth of cash and diamonds was not properly accounted for, however, does not mean that all of this property was misappropriated by Yehuda. Hanan's calculation does not allow for money transported in cash to Joseph and Isak in Israel. As found above, Yehuda has persuasively documented that a substantial sum of cash was repatriated in this way. However, the fact that some money was transported this way does not mean that all of the missing amount was thus transported. Nor does the fact that much of the business was conducted in unreported cash entail the conclusion that all of the cash was returned to the owners of the business.

55. Yehuda's conduct supports the conclusion that he did not deal honestly with his employers. First, his dishonesty was documented in the matter of the checks made out to Pointers, Inc., the funds from which defendant admits he appropriated and for which he offered a patently incredible explanation. Second, defendant's removal of Forest's business records, his return of them in disarray, and the destruction of the hard drive of his personal computer, all appear to have been efforts to disguise the fact that significant funds were missing from Forest's accounts and to impede the recovery of those assets. Third, Yehuda's establishment of a competing business under a similar name was not only deceitful in itself, but seems to have been crafted in such a way as to maximize confusion between the enterprises and to facilitate misappropriation of Forrest's assets. Fourth, the presence of large amounts of cash, and the informal methods both of transporting cash back to Israel and of auditing Yehuda's accounts, created an opportunity for misappropriation that would not be present in a business that eschewed untraceable cash. The preponderance of the evidence established that Joseph and Isak lied about their encouragement of cash operations in New York, and about their receipt of unreported cash income. It does not follow that they would pursue this litigation, and risk the exposure of potential tax evasion, money laundering and unreported currency transactions, if they knew that they had received all that they were entitled to, in which case they would also know that Yehuda had no substantial reserves to pay a judgment.

56. Plaintiff has established, by a preponderance of the evidence, that Yehuda, who was in total control of its New York office and of the large amounts of cash that the office generated, cannot account for a very substantial amount of the property entrusted to him. Plaintiff has further established that Yehuda destroyed or attempted to destroy or hide records essential to

21

reconstructing the office's accounts and that he behaved faithlessly in a number of ways, including the documented misappropriation of $71,000. On this record, the inference that a substantial part of the missing money found its way into Yehuda's pockets is compelling, at least absent a credible explanation. While Yehuda has presented evidence permitting the conclusion that some of the missing money was returned to the principals in Israel, the Court declines, in the absence of further corroboration, to accept Yehuda's suggested inference that *all* of the missing money was returned in this way.

57. The Court therefore determines that Yehuda converted at least some of the amount missing from Forest's accounts, but not the entire amount. Defendant's witnesses and documentary evidence persuasively demonstrate that Forest conducted a significant portion of its business in cash and that approximately $176,400 of this cash was returned to Isak and Joseph in Israel, both through Boruchov and through other intermediaries. The transfer of cash receipts to Israel was not included in the loss estimation prepared by Hanan. For this reason, the Court finds that only $352,481of the missing amount was misappropriated by defendant.

## CONCLUSIONS OF LAW

In light of the finding above that a significant portion of the amount missing from plaintiff's accounts is attributable to appropriation of money and other property by defendant, the legal issues presented are straightforward. Defendant argues that plaintiff has not met its burden of proof as to the amount and character of the property converted, or in the alternative, that the Court should deny plaintiff recovery as a matter of public policy. Both arguments are without merit.

22

## I. Conversion Claim

1. Under New York law, a conversion takes place when someone intentionally assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y. 3d 43, 49-50 (2006). Wrongful intent is not an element of conversion. See Corporacion Fruticola De Chincha, SAC v. Watermelon Depot, Inc., No. 05 Civ. 6293 (KNF), 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008). However, where, as here, the property in question is money, that money "must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." Republic of Haiti v. Duvalier, 626 N.Y.S.2d 472, 475 (1st Dep't 1995).

2. Both elements of a conversion claim under New York law are met here. A corporation has a clear possessory interest both in its inventory and in the proceeds of its sales. By pocketing the diamonds and/or the proceeds from their sale himself, defendant has interfered with the plaintiff's dominion over this property.

3. Defendant argues that plaintiff has not met its burden of proof because it has not been able to show the extent to which defendant converted the proceeds from the sales of its diamonds as opposed to converting the diamonds themselves. (Def's Findings of Fact and Concl. of Law, unnumbered page 7; see also Def's Closing Arg., unnumbered page 11.) This argument is without merit. New York law does not require a plaintiff to identify converted property with exacting precision. See, e.g., Aetna Cas. & Sur. Co. v. Glass, 428 N.Y.S.2d 246 (1st Dep't 1980) (modifying a judgment holding defendant liable for converting 4,500 pigs of solder to a judgment for 400 pigs on the basis of a reasonable estimate of the amount of solder converted).

23

Furthermore, plaintiff's difficulties in demonstrating the precise amount and character of the property converted are due to defendant's own destruction of evidence both before and after this litigation began. In such a circumstance, where plaintiff has clearly sustained damage and the defendant has himself prevented precise computation of the amount, the factfinder may make a reasonable estimate of damages based on relevant data. Reynolds Securities, Inc. v. Underwriters Bank & Trust Co., 44 N.Y. 2d 568, 574 (1978), citing Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 264 (1946). Plaintiff's imprecision as to precisely what and how much defendant converted is not, therefore, a basis for denying it recovery.

4. Defendant additionally argues that he should be relieved of liability, either partially or wholly, on the basis of New York Civil Practice Law and Rules § 1411 ("NY CPLR § 1411"), which he construes as authorizing the Court to deny plaintiff recovery of its converted funds upon finding that it has "engaged in . . . behavior repugnant to public policy." (Def's Closing Arg., unnumbered page 12; see also Def's Findings of Fact and Concl. of Law, unnumbered page 9.) NY CPLR § 1411, popularly known as New York's "comparative negligence statute," provides that in tort suits "the amount of damages . . . recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages." Defendant identifies numerous instances of "culpable" conduct attributable to plaintiff, including its apparent failure to pay taxes on its profits. (Def's Findings of Fact and Concl. of Law, unnumbered page 9.)

5. As a threshold matter, it is not clear that NY CPLR § 1411 can be asserted as a defense to intentional torts. Compare Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 575 (E.D.N.Y.1999) and Scott v. Dime Sav. Bank, 886 F.Supp. 1073,

1081 (S.D.N.Y. 1995) <u>with</u> <u>Celebrity Cruises Inc. v. Essef Corp.</u>, 530 F. Supp. 2d 532, 541

(S.D.N.Y. 2008). Even were the provision applicable, NY CPLR § 1411 does not, as defendant

contends, provide a general public policy exception to the normal rules for apportioning damages

and the Court may not deny or limit plaintiff's claim on the basis of its tax status or other similar

findings. Rather, NY CPLR § 1411 is intended to insure that where a defendant is shown to be

only a partial cause of a plaintiff's loss, plaintiff should not be able to recover for that portion of

its loss caused by its own actions. <u>Bank Brussels Lambert v. Chase Manhattan Bank, N.A.</u>, No.

93 Civ. 5298, 1999 WL 710778, at *2 (S.D.N.Y. Sept. 10, 1999). In this case, none of the legally

dubious conduct engaged in by plaintiff caused – either wholly or in part – the loss it suffered

when defendant converted its property. For this reason, NY CPLR § 1411 does not provide a

basis for diminishing defendant's liability.

6. Even if it were argued that plaintiff's sloppy oversight of Yehuda and its operation of

its business largely in cash made it possible for defendant to convert plaintiff's belongings, this

argument would not avail defendant. Negligence in failing to prevent or detect defendant's

wrongful conduct is not a defense to an intentional tort. <u>See</u> <u>Long Island Savings Bank, FSB v.</u>

<u>Bigman</u>, No. CV 89-0927, 1991 WL 144224, at *6-7 (E.D.N.Y. June 25, 1991) (finding that

plaintiff's negligence in failing to detect defendant's fraud could not be asserted as defense); <u>See</u>

<u>also</u> <u>Celebrity Cruises</u>, 530 F. Supp. 2d at 541 (finding that, in applying NY CPLR § 1411 to

intentional torts, "courts are understandably reluctant to 'blame the victim' by reducing the

compensation" to plaintiffs on the basis of their own negligence.) Simply put, a thief is not

entitled to keep his loot because his victim did not intend to pay taxes on the stolen money.

## II.    **Bankruptcy Claim**

7.  11 U.S.C. § 523(a) enumerates a list of circumstances under which a debt is not dischargeable in a proceeding under Chapter 7 of the United States Bankruptcy Code.  The burden of proof is on the party claiming nondischargeability, In re Hambley, 329 B.R. 382, 400 (Bankr. E.D.N.Y. 2005), and the burden must be carried by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  Exceptions to dischargeability should be construed liberally in favor of the debtor to further bankruptcy's goal of providing her with a "fresh start."  In re Landrin, 173 B.R. 307, 310 (Bankr. S.D.N.Y. 1994).  Although plaintiff's bankruptcy claim was clearly delineated in the parties' Amended Joint Pre-Trial Statement, and discussed by the Court on the final day of trial (8/13/09 Tr. 711), defendant's post-trial submissions do not discuss the bankruptcy issues or respond to plaintiff's arguments for non-dischargeability.

8.  Section 523(a)(4) provides, among other provisions, that a debt due to "embezzlement" is not dischargeable.  Federal law, which governs the interpretation of this provision, defines embezzlement for the purposes of Section 523(a) proceedings as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  In re Graziano, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983), quoting In re Carlton, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982).  Conversion on its own, absent an intent to defraud, does not constitute embezzlement under this provision.  In re Bevilacqua, 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985).  However, where evidence – including circumstantial evidence – indicates that a convertor intended to defraud the rightful owner of her property, the conversion constitutes embezzlement and a finding of nondischargeability is warranted.  Id.

26

8. The factual findings of the Court compel the conclusion that defendant intended to defraud the plaintiff. Not only did defendant take for himself the plaintiff's money and physical property, but, in at least one instance, he did so by subterfuge – making a check out to Pointers, Inc. rather than to himself. Additionally, defendant operated an unauthorized side business that directly competed with the business of his employer, Forest. Lastly, both before and after this litigation began, defendant attempted to cover his tracks by removing Forest's business records and by destroying the hard drive of his computer. Thus, the conclusion is unavoidable that defendant's acts of conversion involved the sort of intentional misappropriation from his employer that constitutes "embezzlement" under the Bankruptcy Code and that defendant's obligation to pay damages to plaintiff is not dischargeable in bankruptcy.

9. Alternatively, defendant's debt to plaintiff is not dischargeable under Section 523(a)(6), which exempts from discharge debts arising from "willful and malicious injury by the debtor to . . . the property of another entity." In order to succeed in a claim under this subsection, plaintiff must show that defendant converted its funds deliberately or intentionally, In re Scheller, 265 B.R. 39, 54 (Bankr. S.D.N.Y. 2001), and with either "actual or constructive malice." Id. With malice, in this instance, does not mean with personal animus, but simply that the act is wrongful and without cause or excuse. In re Stelluti, 94 F.3d 84, 94 (2d Cir. 1996). As outlined above, plaintiff has provided compelling evidence that defendant appropriated its money through subterfuge and without any cause or excuse.

27

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff has proven, by a preponderance of the evidence, that defendant converted money and other property worth $352,481. Accordingly, the Court awards plaintiff damages in that amount. Additionally, defendant's debt to plaintiff arising from this conversion is not dischargeable in bankruptcy. The Clerk is directed to enter judgment accordingly.

A copy of this opinion will be transmitted to the United States Attorney for the Southern District of New York and to the Internal Revenue Service, for possible investigation of any of the conduct discussed herein.

SO ORDERED.

Dated: New York, New York
        January 14, 2010

GERARD E. LYNCH
United States Circuit Judge

The Clerk of Court is directed
to close this case. Any pending
motions are moot.